UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────

TINA PFERRER-TUTTLE,

                        Plaintiff,
          -vs-                              **No. 1:14-CV-00727 (MAT)**
                                            **DECISION AND ORDER**
CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,
                        Defendant.

─────────────────────────────


## I.   Introduction

     Represented by counsel, Tina Pferrer-Tuttle ("plaintiff") brings this action pursuant to Titles II and XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons discussed below, plaintiff's motion is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order.

## II.  Procedural History

     The record reveals that in February 2011, plaintiff protectively filed applications for DIB and SSI, alleging

disability as of July 31, 2009 due to back pain and bipolar disorder. After her application was denied, plaintiff requested a hearing, which was held before administrative law judge Michael Friedman ("the ALJ") on December 13, 2012. The ALJ issued an unfavorable decision on December 19, 2012. The Appeals Council denied review of that decision and this timely action followed.

## III. Summary of the Evidence

### A.   Plaintiff's Reports

Plaintiff, who was 39 years old at the time of her hearing, testified that she last worked as a nurse's assistant in 2008, but had to stop working due to "problems with [her] back" and a new diagnosis of bipolar disorder. T. 70. She testified that her back pain radiated to her legs, and that she had terminated physical therapy and did not have surgery because her doctor told her it would do "more damage than good." Id. at 70-71. She used a TENS unit daily, with an hour rest in between uses. According to plaintiff, even when using the TENS unit, her pain was "over a 10, and in cold weather [it was] even worse." T. 76.

Plaintiff testified that she could stand and sit for half an hour to an hour at the most, walk for up to 20 minutes at a time, and lift five pounds. According to plaintiff, she could not perform the duties of a "sit-down" job because she could not sit for more than a half hour to an hour. T. 74. She testified that she grocery shopped with her boyfriend and did dishes, but could not vacuum,

2

and that she had to take breaks wen performing household chores like laundry. She stated that she used to enjoy horseback riding and drawing, but that she could no longer do these activities because of her back pain. She testified that she watched television but that she "really [could not] stay concentrating on a book." T. 73. She also stated that she found it hard to concentrate, focus, and be around people she did not know, but that medication prescribed by her psychiatrist helped.

In a function report, plaintiff stated that she could cook only simple meals that did not take long to prepare, and that she could clean and do dishes and laundry but with breaks due to back pain. She reported that she went outside only for doctor's appointments and grocery shopping. She also stated that she got "very nervous being around people" and shopped only once a month so as to avoid interacting with people. T. 216.

## B.   Medical Evidence

### 1.   Treating Sources

Treatment records from Family Health Medical Services ("Family Health") covering the time period from approximately May 2011 through August 2012 document plaintiff's repeated complaints of back pain and treatment by Dr. Jeremy Riedesel. Plaintiff also treated with Family Health on at least two occasions for epidural injections for back pain. Although these treatment notes contain references to plaintiff's repeated complaints of back pain, most of

3

the notations of physical examinations during this time period show essentially normal findings, and often did not include neurological or musculoskeletal findings. Plaintiff's mental status was consistently noted as essentially normal.

In April 2011, plaintiff entered into a pain management contract with Family Health, in which she agreed to routine drug testing. Plaintiff's treatment included prescriptions for several medications, including Trazodone, Seroquel, and Citalopram for mood symptoms, naproxen and hydrocodone/acetaminophen for pain, Depo-Provera for contraception, Topamax for headaches, and Levothyroxine for hyperthyroidism. Also in April 2011, plaintiff reported that her pain improved with physical therapy and use of a TENS unit. At that time, Dr. Riedesel noted limited ranges of motion ("ROM") due to back pain, and a positive straight leg raise ("SLR") test. Dr. Riesedel noted that he believed plaintiff's "functional capacity [was] very limited due to her low back pain" and that she was unable to work at that time. T. 310. He referred plaintiff to a neurosurgeon for follow-up.

On follow-up with neurosurgeon Dr. Walter Grand in May 2011, plaintiff had increased lordosis of the spine, but no definitive abnormality. She had limited ROM upon bending and moving side to side, but could stand on heels and toes, had a normal gait, and demonstrated good muscle and motor strength. Dr. Grand noted that he saw "no clear-cut focal signs" for plaintiff. T. 434. Plaintiff

4

next saw Dr. Jody Leonardo, another neurologist, who noted full motor strength but a positive Hoffman's sign in the left arm, for which an MRI showed no etiology. The MRI also showed a normal skull base and a high cervical portion within normal limits. Flexion extension x-rays showed no instability with flexion or extension. In July 2011, Dr. Leonardo reviewed a March 2011 MRI which showed a centrally herniated disc at L4-L5. Upon examination, plaintiff had full motor strength but uneven reflexes and a positive Hoffman's sign. Dr. Leonardo recommended conservative treatment including physical therapy and epidural steroid injections.

In April 2011, plaintiff was seen at the Westfield Memorial Hospital ER for a seizure secondary to an accidental overdose of Ultram, a pain medication. Plaintiff reported having run out of Vicodin and taking an overdose of Ultram to compensate. An MRI of her brain was normal, and plaintiff was discharged after a one-day stay at Saint Vincent Health Center.

As noted above, most of the treatment notes from Family Health did not note findings of neurological or musculoskeletal examinations, with the following exceptions. In October 2011, neurological examination was normal. In June 2012, neurological and musculoskeletal examinations were normal, plaintiff had an even gait, and plaintiff demonstrated five out of five strength of upper and lower extremities. Later that month, plaintiff denied neurological and musculoskeletal symptoms and was noted as

displaying comfort throughout the neurological exam. In July 2012, plaintiff had a slow gait, but spinal landmarks and spinal contour were noted as normal. In August 2012, plaintiff had a normal gait, but reported being "[e]xtremely limited due to pain"; Dr. Riedesel increased her hydrocodone dosage. T.624-25.

Plaintiff treated with Dr. Ralph Walton at Family Health for psychiatric symptoms. Dr. Walton noted a diagnosis of bipolar disorder, and his treatment notes, dated March 2011 through October 2012, discuss plaintiff's repeated relationships with her boyfriend. He prescribed Seroquel for mood symptoms, which plaintiff reported helped to stabilize her moods. Dr. Walton's treatment records do not contain notes of mental status examinations, but rather narrative summaries of treatment sessions.

After the ALJ's decision, Plaintiff submitted a medical source statement from Dr. Walton to the Appeals Council. In that statement, dated March 27, 2013, Dr. Walton noted frequent depressive episodes, and opined that plaintiff had a marked limitation making judgments on complex work-related decisions; moderate limitation in understanding, remembering, and carrying out complex instructions; and mild limitation in interacting appropriately with the public, supervisors, and coworkers and in responding appropriately to work situations and changes in a routine setting. According to Dr. Walton, plaintiff was not capable of working "in any capacity" at that time. T. 10. Dr. Walton also

checked boxes indicating that it was "not recommended" that plaintiff be exposed to noise, a high rate of working speed, responsibility for others, or responsibility for decisions.

### 2. Consulting Sources

Dr. Nikita Dave completed a consulting internal medicine examination in April 2011. Plaintiff reported the ability to cook, shower, bathe, and dress daily, and stated that she did "limited cleaning, laundry, and shopping." T. 313. Plaintiff reported tenderness in the lumbar spine, and straight leg raise of the bilateral lower extremities was positive at 65 to 70 degrees. Otherwise, physical exam was essentially normal. Dr. Dave opined that plaintiff had "[m]oderate limitation for prolonged sitting, standing, walking, repetitive bending to the lumbar spine, lifting, carrying, pushing, pulling of heavy objects, pending further consults and plan." T. 315.

Dr. Sandra Jensen, Ph.D., completed a psychiatric evaluation in April 2011. Plaintiff reported that with the addition of a recent new medication, Seroquel, her bipolar disorder symptoms had improved, but stated that she "still [had] some ups and downs," and was "more depressed than manic." T. 317. On mental status examination, plaintiff's "[m]otor behavior was restless," eye contact was poor, speech was "prosodic [and] fast in rate," thought processes were "[a] little circumstantial, but coherent," affect was irritable, mood was neutral, and plaintiff was oriented times

three. T. 317-18. Her attention and concentration were mildly impaired due to anxiety, she was able to do one-step but not two-step calculations, and she could perform serial threes only with great concentration. Recent and remote memory skills were intact, and she demonstrated average intellectual functioning. Plaintiff reported being able to "do all ADLs except as limited by pain." T. 318.

Regarding vocational functional capacity, Dr. Jensen opined that plaintiff was "able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn tasks, and perform complex tasks with supervision within normal limits." T. 318-19. Dr. Jensen also opined that plaintiff's "ability to make appropriate decisions, relate adequately with others, and appropriately deal with stress [would] be mildly to markedly impaired because of bipolar disorder and resultant anxiety." T. 319.

Dr. T. Andrews completed a psychiatric review technique form in June 2011. Dr. Andrews concluded that plaintiff's mental impairment was not severe, and opined that she had no limitations in ADLs, no repeated episodes of decompensation, and mild difficulties maintaining social functioning and maintaining concentration, persistence, or pace. Based on a review of plaintiff's medical record, Dr. Andrews found that plaintiff was

"psychiatrically able to perform [substantial gainful activity], but may benefit from work in a low stress, low contact occupation." T. 448. Dr. Andrews specifically stated that he gave "little weight" to Dr. Jensen's conclusion that plaintiff would be mildly to markedly limited in making appropriate decisions, relating with others, and appropriately dealing with stress, opining that "this statement [was] not consistent with [Dr. Jensen's] own findings and diagnosis (no anxiety [disorder])." Id.

In May 2012, Dr. Edward Layne, a consulting neurosurgeon, reviewed plaintiff's medical record and affirmed a June 14, 2011 disability assessment performed by single decision maker J. Davie, specifically noting that he affirmed the assessment of credibility assessment as well as functional capacity. The June 2011 assessment noted conflicts in plaintiff's reports of pain due to headaches, and opined that plaintiff's medical record "warrant[ed] restriction to light work due to ongoing low back pain." T. 84. The assessment also found that plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds; sit, stand, and/or walk for six hours in an eight-hour workday; push and pull without limitation; occasionally climb ladders, ropes, and scaffolds; occasionally stoop and crawl; and frequently climb stairs, balance, kneel, and crouch.

**IV.   The ALJ's Decision**

The ALJ followed the well-established five-step sequential evaluation promulgated by the Commissioner for adjudicating disability claims. See 20 C.F.R. § 404.1520. Initially, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2009. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 31, 2009, the alleged onset date. At step two, the ALJ found that plaintiff's back pain/lumbago and bipolar disorder were severe impairments. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. In assessing the effects of plaintiff's bipolar disorder on her functioning and applying the "B" criteria of the listings, the ALJ concluded that plaintiff had no restrictions in activities of daily living ("ADLs"), mild restrictions in social functioning, and moderate difficulties maintaining concentration, persistence or pace. The ALJ found that plaintiff had no prior episodes of decompensation.

Before proceeding to step four, the ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform sedentary work, except that she could perform only simple work requiring occasional contact with others. At step four, the ALJ found that plaintiff did not have the ability to perform past relevant work. At step five, the ALJ determined that, considering

10

plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that plaintiff could perform. The ALJ found that plaintiff's nonexertional impairments did not significantly erode the occupational base of unskilled sedentary work, and referenced the Medical-Vocational Guidelines ("the grids"), specifically grid rule 204.00, in determining that jobs existed which plaintiff could perform. Accordingly, the ALJ concluded that plaintiff was not disabled.

## V.   Discussion

A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by "substantial evidence" or if the decision is based on legal error. 42 U.S.C. § 405(g); see also Green-Younger v. Barnhard, 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

Plaintiff contends that (1) the Appeals Council erred in declining to find a treating psychiatrist opinion, submitted after the hearing decision, to be new and material evidence; (2) the ALJ's mental RFC finding was unsupported by substantial evidence; (3) the ALJ erred in failing to call a vocational expert ("VE"); and (5) the ALJ improperly assessed plaintiff's credibility.

A.    **Evidence Submitted to Appeals Council**

Plaintiff argues that the March 27, 2013 from treating psychiatrist Dr. Walton was new and material evidence and that the Appeals Council should have reviewed the ALJ's decision based on this evidence. The Appeals Council considered the opinion, but found that it related to a time period after the ALJ's decision, and therefore did not affect it.

"If the new evidence relates to a period before the ALJ's decision, the Appeals Council 'shall evaluate the entire record including the new and material evidence submitted . . . [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" <u>Perez v. Chater</u>, 77 F.3d 41, 44 (2d Cir. 1996) (citing 20 C.F.R. §§ 404.970(b), 416.1470(b)). Evidence is "new" when it has not been considered previously in the administrative process. See <u>Ovitt v. Colvin</u>, 2014 WL 1806995, *3 (N.D.N.Y. May 7, 2014). New evidence is "material" where it is both relevant to the plaintiff's condition during the relevant time period, and probative. <u>Pollard v. Halter</u>, 377 F.3d 183, 193 (2d Cir. 2004). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." <u>Id.</u>

Dr. Walton's report was new, as it was prepared after the date of the ALJ's decision. Contrary to the Appeals Council's finding, however, Dr. Walton's report was relevant to the applicable time period. The report does not specifically state any dates of applicability, but plaintiff had a longstanding treatment relationship with Dr. Walton which predated the ALJ's decision and which was apparent from the administrative record. See, e.g., Davidson v. Colvin, 2013 WL 5278670, *7 (N.D.N.Y. Sept. 18, 2013) (holding that evidence was not merely cumulative, where record had not previously contained an opinion from a treating psychiatrist); cf. Collins v. Comm'r of Soc. Sec., 960 F. Supp. 2d 487, 501 (S.D.N.Y. 2013) (holding that new evidence was not material, because none of the medical professionals had treated claimant during the relevant time period).

Additionally, Dr. Walton's report was probative, as it constituted an opinion from a treating psychiatric source, which evidence was absent from the record at the time the ALJ issued his decision. Finally, there is a reasonable possibility that this report may have changed the ALJ's decision, because it provides a treating source's functional assessment of plaintiff's mental capabilities which is considerably more restrictive than any evidence previously in the record. This is especially significant in light of the fact that the only functional assessments relied upon by the ALJ came from consulting sources, and Dr. Walton's

report would be entitled to controlling weight under the treating physician rule. See, e.g., <u>Davidson</u>, 2013 WL 5278670, at *8-9 ("[W]here newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion. . . . Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is grounds for remand") (internal quotation marks omitted).

The Appeals Council erred in failing to consider the report, as it became part of the administrative record at the time of its submission to the Appeals Council:

> The regulations require the Appeals Council to "evaluate the entire record including the new and material evidence submitted . . . [and] review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." [20 C.F.R. §§ 404.970(b) [and] 416.1470(b)]. Therefore, even when the Appeals Council declines to review a decision of the ALJ, it reaches its decision only after examining the entire record, including the new evidence submitted after the ALJ's decision.

<u>Perez</u>, 77 F.3d at 45. The Appeals Council did not conduct the required examination of the record here, because it dismissed of the new evidence as applying to a time period after the ALJ's decision, rather than properly considering the new evidence as part of the administrative record. The case is therefore remanded for consideration of this new evidence, with proper application of the treating physician rule.

14

**B.    Mental RFC; Weight Accorded to Dr. Jensen's Opinion**

At the time the ALJ made his decision, the administrative record contained two consulting opinions regarding plaintiff's mental functional capacity. The first, by Dr. Jensen, was based on Dr. Jensen's examination of plaintiff. The second, by Dr. Andrews, was based on Dr. Andrews' evaluation of plaintiff's medical record, including Dr. Jensen's report. Although Dr. Jensen stated, rather vaguely, that plaintiff would be "mildly to markedly" impaired in making appropriate decisions, relating adequately with others, and appropriately dealing with stress, Dr. Andrews opined that these limitations were not supported by plaintiff's overall medical record and by Dr. Jensen's examination specifically.

Plaintiff contends that the ALJ erred in formulating a mental RFC and in so doing, giving little weight to Dr. Jensen's opinion regarding plaintiff's limitations. However, Dr. Andrews, also a qualified consulting medical professional, concluded that plaintiff had mild limitations in maintaining social functioning and maintaining concentration, persistence, and pace. The ALJ, in turn, actually concluded that plaintiff's limitations were greater than those assessed by Dr. Andrews: the ALJ found that while plaintiff had mild limitations in social functioning, she had moderate limitations in maintaining concentration, persistence, or pace. The ALJ then incorporated Dr. Andrews' opinion that plaintiff could work "but may benefit from work in a low stress, low contact

occupation" when he found that plaintiff could perform simple work requiring only occasional contact with others.

Considering the record before the ALJ, it cannot be said that the ALJ's finding was not based on substantial evidence. However, with the addition of the functional assessment submitted by treating psychiatrist Dr. Walton, the ALJ's interpretation of the two consulting opinions may have changed. On remand, the ALJ is directed to reassess plaintiff's mental RFC with reference to all of the relevant medical opinions, and accord each the weight he deems appropriate under the regulations, considering the entire administrative record.

### C.    Failure to Call Vocational Expert

Plaintiff contends that the ALJ erred in failing to call a VE. Where a claimant's nonexertional impairments significantly diminish her ability to work beyond any incapacity caused solely from exertional limitations, and she is unable to perform the full range of employment under the grids, a VE must be consulted. See Bapp v. Bowen, 802 F.3d 601, 603 (2d Cir. 1986). However, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." Id. at 602. To establish that reference to the grids is inadequate and that the use of a vocational expert is mandatory, nonexertional impairments must "so narrow[] a claimant's

possible range of work as to deprive [her] of a meaningful employment opportunity." Id.

There was no such evidence before the ALJ in this case. See, e.g., Velez v. Astrue, 2013 WL 474281, *12 (N.D.N.Y. Feb. 7, 2013) ("Plaintiff does not cite to any portion of the record or any treatment note that indicates that plaintiff's non-exertional impairments significantly impacted his ability to perform work-related functions."). As the Court has already found, based upon the record before him, the ALJ's mental RFC was supported by substantial evidence. Therefore, the ALJ was entitled to rely on the grids. See Medley v. Colvin, 2015 WL 4112477, at *5 (W.D.N.Y. July 8, 2015) ("[S]ince Plaintiff's non-exertional limitations did not significantly erode her occupational base for work at all exertional levels, the ALJ properly applied Grid Rule 204.00 as a framework for determining that Plaintiff was not disabled within the meaning of the Act.").

This finding by the Court should not be taken to mean that a VE will be unnecessary upon consideration after remand. On remand, taking the entire record into consideration, including Dr. Walton's treating opinion, "when considering nonexertional impairments, the ALJ must first consider the question – whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony." Velez, 2013 WL 474281, at *11. If the ALJ so finds, the "Secretary must introduce

the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform." Bapp, 802 F.2d at 603.

### E.   Credibility

Plaintiff contends that the ALJ improperly assessed plaintiff's credibility, arguing that the ALJ failed to explicitly consider the various factors laid out in 20 C.F.R. § 404.1529. However, an ALJ's failure to address each particular factor "does not necessarily mean it was not *considered*." Dillingham v. Colvin, 2015 WL 1013812, *7 (N.D.N.Y. Mar. 6, 2015) (emphasis in original). "Reviewing courts are more concerned with whether administrative decisions reflect that the entire record was considered, whether the substance of the prescribed analytical protocol was not traversed, and whether the ultimate finding is supported by substantial evidence." Id. (citing Cichocki v. Astrue, 729 F.3d 172, 177–78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand)).

The ALJ found plaintiff not fully credible as to the "intensity, persistence and limiting effects of [her] symptoms." T. 52. In the context of his discussion of plaintiff's credibility and review of the record, the ALJ cited, among other sources, 20 C.F.R. §§ 404.1529 and 416.929, and SSR 96-7p. The ALJ's decision, which incorporates his review of the testimony, indicates

that the ALJ used the proper standard in assessing credibility, especially in light of the fact that the ALJ cited relevant authorities in that regard. See Britt v. Astrue, 486 F. App'x 161, 164 (2d Cir. 2012) (finding explicit mention of 20 C.F.R. § 404.1529 and SSR 96-7p as evidence that the ALJ used the proper legal standard in assessing the claimant's credibility); Judelsohn v. Astrue, 2012 WL 2401587, *6 (W.D.N.Y. June 25, 2012) ("Failure to expressly consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record."). Although there was evidence in the record to support an underlying medical impairment which resulted in plaintiff's complaints of pain, there was also evidence to indicate that these complaints were not supported by the medical record as a whole. Although Dr. Riedesel intermittently recorded plaintiff's limited range of motion and pain upon examination, he also often recorded normal findings, and other treating sources, including Drs. Leonardo and Grand, also made essentially normal findings. After a review of the record evidence and the ALJ's decision, the Court concludes that the ALJ's credibility determination was based on a proper application of the law and is supported by substantial record evidence.

## VI.   Conclusion

For the foregoing reasons, the Commissioner's cross-motion for judgment on the pleadings (Doc. 13) is denied, and plaintiff's motion for judgment on the pleadings (Doc. 9) is granted to the extent that this matter is remanded to the Commissioner for further administrative proceedings consistent with this Decision and Order. The Clerk of the Court is directed to close this case.

**ALL OF THE ABOVE IS SO ORDERED.**


**S/Michael A. Telesca**

HON. MICHAEL A. TELESCA
United States District Judge

Dated:      September 30, 2015
            Rochester, New York.